**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MESA UNDERWRITERS SPECIALTY** | ) | **CASE NO.  1:16 CV 2035** |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **SECRET'S GENTLEMAN'S CLUB, et al.,** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **Defendants.** | ) | |

This matter is before the Court on the Motion for Judgment on the Pleadings filed by Plaintiff, Mesa Underwriters Specialty Insurance Company ("Mesa") (Docket #30); the Motion for Partial Summary Judgment filed by Defendants, GLMR, Inc. and Secrets Gentleman's Club ("Secrets/GLMR") (Docket #31); and, the Motion for Partial Summary Judgment filed by Defendants Sharon and Terry Snyder (Docket #32).

**I.     Factual and Procedural Background.**

On April 5, 2014, Desiree Snyder was killed when the vehicle she was a passenger in was struck head-on by a vehicle driven by Julio Vargas, who was heavily intoxicated and traveling the wrong way on I-480.   Minutes before the accident, Mr. Vargas had been asked to leave Secrets Gentleman's Club ("Secrets").

At the time of the accident, Secrets was insured by Mesa under a Commercial General

Liability Coverage Policy (hereafter "the Policy").[1]  Claims of ordinary negligence are covered as "occurrences" under the Policy.   (Docket #1-1, The Policy at Section V - Definitions).  The Policy includes a Liquor Liability exclusion, which excludes the following from coverage:

> "Bodily Injury" or "property damage" for which any insured may be held liable by reason of:
> (1) Causing or contributing to the intoxication of any person;
> (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or
> (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

On January 28, 2015, Ms. Snyder's family filed a lawsuit in the Cuyahoga County Court of Common Pleas, Case No. CV-15-839575 (the "State Court Action"), against Mr. Vargas and several others, including Secrets/GLMR and Gigi's Lounge, another establishment where Mr. Vargas had spent time on the evening of the accident.  The State Court Complaint included claims against Secrets/GLMR and Gigi's for wrongful death; violations of Ohio statutory law; common law negligence; conscious disregard, willful and wanton misconduct; survivorship; and, loss of consortium.

Mesa received notice of the State Court Action one day after it was filed and sent a letter to Secrets/GLMR the following day indicating that it would not defend or indemnify Secrets/GLMR against what Mesa stated was a "liquor liability claim." (Docket #31-5 at p. 4.) (Mesa did, however, provide a defense for Gigi's in the State Court Action because Gigi's had purchased additional liquor liability coverage.)  Secrets/GLMR subsequently obtained Counsel at its own expense.  Counsel for Secrets/GLMR repeatedly contacted Mesa during the pendency of the State Court Action, directing Mesa's attention to what Counsel perceived to be allegations

---

[1]

    Policy No. MP003400100890, Docket #31-9.  See also Docket #31-5 (letter dated February 25, 2015 from Mesa indicating that Secrets is the named insured of this Policy).

-2-

of common law negligence unrelated to the sale or service of alcohol.  For various reasons, Mesa repeatedly denied it was required to defend or indemnify Secrets/GLMR for the claims asserted by the Snyders.

Trial in the State Court Action was scheduled for May 25, 2016.  Days prior to trial, the Snyders and Secrets/GLMR executed a Stipulation for Consent Judgment.  The Snyders and Secrets/GLMR agreed to permit the State Court to conduct an evidentiary hearing and bench trial on certain claims once the Snyders had tried their claims against Gigi's.  Nearly a week into trial, the Snyders and Gigi's settled all claims.  Mesa's corporate claims representative was present throughout trial.

On or about May 31, 2016, Secrets/GLMR entered into an Amended Stipulation for Consent Judgment with the Snyders, allowing Secrets to continue to deny liability and allowing the State Court to determine the liability of Secrets/GLMR for the Snyders' common law negligence claims.  (Docket #31-1 at p. 12.)   The Snyders withdrew their Dram Shop claims against Secrets/GLMR and there were no statutory claims before the State Court.

On August 3, 2016, the State Court held an evidentiary hearing.  Mesa was given notice but did not participate in the hearing on behalf of Secrets/GLMR.  Counsel for Gigi's, paid for by Mesa, was present even though by that time the Snyders and Gigi's had settled all claims.  The evidentiary record included 25 deposition transcripts and thousands of pages of admitted exhibits.  (Docket #36, Footnote 2.)

Mesa did not intervene on behalf of Secrets/GLMR during the State Court Action at any time; did not participate in the August 3, 2016 hearing; and, never sought a determination from the State Court as to whether Mesa had a duty to defend or indemnify Secrets in the State Court Action.  Instead, on August15, 2016, prior to a decision being issued by the State Court, Mesa filed its Complaint for Declaratory Judgment in this Court pursuant to 28 U.S.C. § 2201 and

Ohio Rev. Code § 2721.03, asking the Court for a declaration that it has no duty to indemnify

Secrets.

On September 28, 2016, the Trial Court issued the following Findings of Fact and

Conclusions of Law, stating as follows:

On August 3, 2016, this Court held an evidentiary hearing to determine the liability, if any, of Defendant GLMR, Inc. dba Secrets Gentleman's Club (hereinafter "Secrets") on Counts One (wrongful death claims), Five (common law negligence claims) and Seven (survivorship claims) of Plaintiffs' Complaint, as well as the damages to be awarded on these claims, if any.

This hearing was held pursuant to an Amended Stipulation for Consent Judgment ("Stipulation") filed on May 31, 2016.  In this Stipulation, Secrets agreed this Court could properly determine its liability on these Counts, if any, after first conducting an evidentiary hearing and fully evaluating both the liability and damages evidence contained in the evidentiary record.

Notice of the August 3, 2016 hearing was provided to all parties.  Present for this hearing were Attorneys W. Craig Bashein and Stephen T. Keefe, Jr. on behalf of Plaintiffs, and Attorney Ronald Lee on behalf of Secrets. In addition, Attorney Jessica A. Reese attended the hearing on behalf of Gigi's, who is insured by Mesa Underwriters Specialty Insurance Company ("Mesa") – the same insurer who issued a commercial general liability policy to Secrets.  Mesa chose not to intervene or be heard during this hearing, the purpose of which was to determine the liability of its insured and the damages to be awarded, if any.  At no point during this entire litigation did Mesa defend Secrets, whether under a reservation of rights or otherwise, despite having repeated opportunities to do so. In addition, at no point in time before the hearing date of August 3, 2016 or the earlier trial date of May 25, 2016 did Mesa file a declaratory judgment in this or any other court to seek a determination of its duty to defend or indemnify Secrets.

After fully considering the evidence and testimony presented at the hearing, and also independently reviewing all of the relevant pleadings, depositions. trial exhibits, and entire evidentiary record pertaining to the claims at issue, this Court issues the following Findings of Fact and Conclusions of Law:

I. <u>FINDINGS OF FACT</u>

1.  At around 11:44-11:45 pm on Saturday, April 5, 2014, within just a few minutes after Julio Vargas was twice ejected from Secrets in a noticeably and extremely intoxicated condition after assaulting one of its exotic dancers and

-4-

allegedly stiffing her for "dances," Vargas drove onto the nearby I-480 exit ramp going the wrong way and hit and killed 22-year- old Desiree Snyder as an innocent passenger in an oncoming vehicle that was lawfully traveling the proper direction on I-480.

2.  Before having Vargas personally escorted out of Secrets, its General Manager and minority owner, Robert Vianueva, spent at least 15-20 minutes face-to-face with Vargas in the bar. This was after club bouncer Tyrone Johnson brought Vargas to Vianueva upon learning that Vargas had assaulted a club dancer known as Sabrina. Instead of reporting Vargas' noticeably intoxicated condition and assault to the off duty uniformed Cleveland Police Officer who was working on-premises at Secrets that night, Manager Vianueva instead chose to run a $100.00 transaction on the credit card Vargas had on him bearing the name "Sandra Torres." Once the card was successfully run, Vianueva had Vargas personally escorted out of Secrets by Johnson. Manager Vianueva ran this credit charge at 11:35 pm-ten minutes or less before the fatal crash occurred. (Tyrone Johnson Deposition, Tr. Ex. 170, pp. 10, 25-27; Robert Vianueva Deposition, Tr. Ex. pp. 56-57, 68-69, 72-74, 88, 116;Tr. Ex. 49).

3.  The toxicological evidence shows that Julio Vargas' blood alcohol content (BAC) at the time of the crash around 11:44-11:45 pm was likely .263 to .265-well over three times the legal limit. A serum blood draw taken at Metrohealth Medical Center revealed a level of .286, and the Cuyahoga County Medical Examiners' Office results for blood drawn more than two hours after the crash still confirmed a BAC level of .235. (Tr. Exs. 97 & 98; Richard Cerny Deposition, Tr. Ex. 154, pp. 18-19, 71; Expert Report of E. Don Nelson, Pharm. D., Tr. Ex. 134; See also Deposition of E. Don Nelson, Pharm. D., pp. 22-23; Deposition of John F. Wyman, Ph D., p. 28).

4.  As discussed in greater detail below, this Court's determination  of Secrets' liability is not premised on its selling or furnishing of alcoholic beverages to Mr. Vargas or on a statutory violation of Ohio's Dram Shop statute, R.C. §4399.18. Instead, and pursuant to the parties' Stipulation, this Court's sole focus is on Secrets' alleged common law negligence based on the unique and case-specific facts and attendant circumstances involved here, as alleged in Count Five of Plaintiffs' Complaint and further supported and augmented by the evidentiary record. These claims are separate, distinct and independent from the sale or service of alcoholic beverages.

5.  Here, Plaintiffs' negligence claims are consistent with Secrets' own admission that it has an obligation or duty to prevent noticeably intoxicated patrons from driving.  More specifically, Plaintiffs claim, among other things, that Secrets was negligent in failing to inform the uniformed Cleveland Police Officer working at its premises of Vargas' objectively noticeable and extremely

intoxicated state, criminally assaultive behavior, and unauthorized use of a woman's credit card, as well as by choosing to eject him in an objectively and extremely intoxicated condition when it was foreseeable that he would seriously injure others if reasonable precautions were not taken to prevent him from driving.

6.  In order to properly evaluate Secrets' liability for its alleged failure to discharge its common law duty of reasonable or due care to avoid foreseeable harm to others, it is first necessary to examine Mr. Vargas' known alcohol consumption before arriving at Secrets, his extremely intoxicated condition when he arrived at Secrets after leaving nearby Gigi's Lounge, and the unique facts and attendant circumstances of what transpired while Vargas was at Secrets on April 5, 2014.

<u>Julio Vargas and His Alcohol Consumption Before Arriving at Secrets</u>

7.  As of April 5, 2014, Defendant Julio Vargas was a 40-year-old immigrant from Puerto Rico who worked in the Cleveland area as a self-employed mechanic and who lived with his girlfriend, Sandra Torres. (Julio Vargas Deposition, Tr. Ex. 161, pp. 9-11).

8.  As of April 5, 2014, Julio Vargas did not have a valid driver's license. (Richard Cerny Deposition, Tr. Ex. 154, pp. 23, 57; Tr. Exs. 11, 46).

9.  A little over two months earlier, on January 31, 2014, Vargas was charged with a DUI involving a BAC of greater than .17 (433.0l(a)(S)), failing "to have a valid driver's license (435.0l(a)), and failing to stop after causing an accident (435.15), as set forth in Cleveland Municipal Court Case No. 2014 TRC 005532, State of Ohio v. Julio Vargas. (Tr. Exs. 11, 34; See also Cleveland Municipal Court docket in Case No. 2014 TRC 005532 and Cleveland Codified Ordinances, Sections 433.0l(a)(8), 435.0l(a) and 435.15).

10.  At around 5:00-5:30 pm on April 5, 2014, Julio Vargas drank two beers at home around dinner time. Without a valid license, he then drove his girlfriend's vehicle to a nearby liquor store and bought a six-pack of Corona and a pint of Hennessy. He drank two of the beers and two or three shots of Hennessy in the liquor store's parking lot and also snorted some cocaine. He then went to an adult entertainment bar (now known to be Fox's Den) where he consumed three more beers and three more shots of Hennessy. By this point, Vargas had already consumed at least 7 beers and 5-6 shots of Hennessy, for a total of at least 12-13 drinks. He was visibly and noticeably intoxicated at this point. (Julio Vargas Deposition, Tr. Ex. 161, pp. 14-19, 96-99).

11.  Mr. Vargas left Fox's Den and drove down Brookpark Road to Gigi's

-6-

Lounge, another adult entertainment bar. Vargas admits he was impaired and noticeably intoxicated by the time he got there. (Id., at pp. 19-21).

12.  Upon arriving at Gigi's at approximately 7:22 pm, Vargas promptly ordered a Corona beer and another shot of Hennessy. (Jennifer Fievet Deposition II, Tr. Ex. 165, p. 228).

13.  After consuming these two additional drinks, which would have been at least drink numbers 13-14 or 14-15, Vargas was admittedly so intoxicated that he actually blacked out and lacks a memory of what happened after that. (Julio Vargas Deposition, Tr. Ex. 161, at pp. 21-22, 35-36). In fact, he has no memory of even later going to Secrets that evening. (Id.).

14. Gigi's owner, Jennifer Fievet, provided two discovery depositions. In the first one, she testified that she kicked Vargas out of the bar at approximately 8:35 pm because he was "weird," non-responsive, irrational, staring her down, and also trying to take another customer's money. He had also inappropriately shoved her, leaving a bruise, and was behaving aggressively.  (Jennifer Fievet Deposition I, Tr. Ex. 164, pp. 21, 63, 77, 88-91, 93-94, 167).

15.  According to Mike Szalay, the only other customer at Gigi's while Julio Vargas was there, Vargas began speaking with him at the bar after he ordered his first round of drinks and then bought them both a shot. (Michael Szalay Deposition, Tr. Ex. 169, pp. 17-20). This occurred after Vargas had already been served a shot and beer upon his arrival. (Delia Burke Deposition, Tr. Ex. 166, p.7; Jennifer Fievet Deposition II, Tr. Ex. 165, p. 229). While at Gigi's, Vargas purchased drinks using both cash and a credit card. (Michael Szalay Deposition, Tr. Ex. 169, pp. 33-34).

16.  Szalay also testified that Vargas' conversation was "off the wall" while they were sitting together. He thought Vargas had "mental problems" and stated his belief that "everyone was just sort of alarmed by how, you know, different he was." Vargas kept repeating his false belief that Szalay's family owned another Brookpark adult entertainment club located right down the road known as "Secrets," yet this was the first time Szalay ever met Vargas and this wasn't true. Vargas then attempted to take Szalay's money that was sitting in front of him on the bar. The first Gigi's bartender on duty that night, Delia Burke, had to intervene to stop Vargas from doing that.  According to both Burke and Szalay, Vargas was non-responsive to their communications and commands. (Michael Szalay Depo.,  Tr. Ex. 169, pp. 14-20; Delia Burke Depo., Tr. Ex. 166, pp. 11-12, 51-52).

17.  Gigi's Bartender Delia Burke was so concerned about Vargas' behavior that she actually armed herself with her gun. (Christine Sarota Deposition, Tr. Ex. 172, p. 55). At this point, Vargas had now been served at least

two shots and a beer at Gigi's prior to the arrival of the second bartender, Jennifer Fievet, whose shift started at 8:00 pm. Burke testified that she would not have served Vargas any more alcohol based on his behavior. However, Burke's shift ended at 8:00 pm, at which time she closed out her register and reconciled her cash drawer. (Delia Burke Deposition, Tr. Ex. 166, pp. 7, 13-15, 38-39, 42).

18. Jennifer Fievet was deposed a second time on October 21, 2015 after Gigi's cash receipts were finally produced after first being withheld from production. According to the cash receipts, Fievet served Vargas at least three more alcoholic beverages once she took over as bartender. This would have been during his extremely intoxicated state of "blackout." (Julio Vargas Deposition, Tr. Ex. 161, pp. 49-51; Deposition of E. Don Nelson, Pharm. D., pp. 62-63). By this time-before being ejected from Gigi's-Vargas had at least 18 to 19 *or more* alcoholic drinks on board.

19. At approximately 8:35 pm according to Gigi's owner Jennifer Fievet, Vargas' conduct worsened to the point that he was "thrown out" of the bar. Up until the time when Vargas was ejected, there were only two customers in the bar-Vargas and Szalay. Szalay paid for all of his drinks using a credit card, whereas Vargas paid for his drinks using both a credit card and cash. The cash receipts showed that additional beers were sold for cash at 8:06 pm.

20. When Vargas was thrown out of Gigi's, Jennifer Fievet followed Vargas outside the bar into the parking lot to make sure he got into his vehicle and left. (Jennifer Fievet Deposition I., Tr. Ex. 164, pp. 86, 88, 92-93, 136; Michael Szalay Deposition, Tr. Ex. 169, pp. 23, 27-28, 50-51).

21. Throughout his time at Gigi's, Vargas' behavior was described by its staff, dancers, and its only other customer Mike Szalay as "weird", "strange", "bizarre", "annoying", "stared at me stupidly", "just looked at me like he didn't understand me", "moved his arms strangely during his dance", "really hard to understand", "conversation was off the wall", "non-responsive", "aggressive" and "irrational." (Michael Szalay Deposition, Tr. Ex. 169, pp. 14-16, 26, 30, 67; Jennifer Fievet Deposition I., Tr. Ex. 164, pp.76, 85, 88-89, 167-169; Delia Burke Deposition, Tr. Ex. 166, pp. 11-12, 15, 20; Christine Sarota Deposition, Tr. Ex. 172, pp. 10, 17- 19, 22, 56; Amber Moore Deposition, Tr. Ex. 171, pp. 19, 22-23, 39-40, 54-56, 58).

22. After he was ejected from Gigi's, Vargas went to Secrets Gentleman's Club located right down the road from Gigi's, where he remained for the next approximately two hours and forty-five minutes. Indeed, Vargas purchased a drink using the credit card bearing the name of Sandra Torres at 9:03 pm sometime after arriving at Secrets, and he drove away from their parking lot at approximately 11:41-11:42 pm after being twice personally escorted out by Secrets' management. (Tr. Exs. 48, 52; Expert Report of Gregory Baeppler, pp. 6,

9).

23.  The evidence shows that Julio Vargas was already so intoxicated by the time he made it to Secrets that night that he was literally blacked out before he even arrived there. (Julio Vargas Deposition, Tr. Ex. 16.1, at pp. 21-22, 35-36).

24.  There is a dispute over how many drinks Vargas was served at Secrets. Only two credits card receipts were produced for actual drinks being purchased by Vargas using the credit card bearing the name of "Sandra Torres" on it-a charge for $6.75 at 9:03 pm for a dancer drink, and the other for a beer at 9:24 pm. (Tr. Exs. 47-48, Robert Vianueva Deposition, pp. 64-66).

25.  Secrets claims that Vargas was only served one beer throughout his entire time at its club. (Robert Vianueva Deposition, pp. 40-41, 115; Tr. Ex. 47). At the same time, Secrets took no steps to preserve cash receipts and other documents that would reflect relevant information, including after being contacted by the Cleveland Police Department as part of their official investigation. (Robert Vianueva Deposition, pp. l20-121). Cleveland Police Detective Richard Cerny, who headed up the investigation, testified that Secrets was not cooperative with the investigation at all.  It was also well known to Detective Cerny that Secrets, just like Gigis Lounge, was a problem spot. (Richard Cerny Deposition, Tr. Ex. 154, pp. 75-76, 98-99).

26.  The evidence also shows that Vargas made $200.00 in cash withdrawals using Sandra Torres' ATM/credit card on Secrets' premises. (Tr. Ex. 101). This was in addition to the two credit card purchases of alcohol discussed above (Tr. Exs. 47-48) and the unauthorized credit card transaction that Secrets' General Manager Robert Vianueva later chose to run on this same credit card in the amount of $100.00 to pay for alleged dances right before having Vargas personally escorted out. (Tr. Ex. 49).

27.  As Secrets' General Manager and minority owner, Robert Vianueva acknowledges that Secrets has an obligation or duty to prevent noticeably intoxicated patrons from driving. (Robert Vianueva Deposition, pp. 53-54). This includes Secrets' duty to call the police to make sure extremely intoxicated patrons do not drive, or at least arranging transportation by calling a taxi or having a bouncer drive them home. (Id. at 53-54, 104-105, 163-165).

28.  Here, neither Manager Vianueva nor any of his employees at Secrets had received any structured or formal alcohol awareness training as part of their employment with Secrets. Instead, Manager Vianueva claims he provides verbal instructions on alcohol awareness to Secrets' employees based on 2 pages of notes from training he claims to have received while working at another bar 15 years ago. (Robert Vianueva Deposition, pp. 17-18, 94-100).

29. Christine Sarota worked as a dancer at Secrets for about a month before leaving to go to work at Gigi's instead. Robert Vianueva was her manager while she was at Secrets. Ms. Sarota confirmed that she was never given any rules, policies or procedures on alcohol awareness while at Secrets. (Christine Sarota Deposition, Tr. Ex. 172, pp. 26-28).

30. Monica Corpening, the bartender who worked at Secrets on April 5, 2014, confirmed that *after* Desiree Snyder's death, a police officer came to Secrets to provide alcohol awareness training. It is her understanding that this training was provided in response to charges that had been brought against Secrets. (Monica Corpening Deposition, Tr. Ex. 168, pp. 17-20).

31. After Vargas made the credit card purchases for the dancer drink and his beer downstairs at Secrets (Tr. Exs. 47-48), he and the dancer known as Sabrina walked upstairs to the VIP area where Ms. Corpening was bartending. Vargas purchased another drink for Sabrina, but Corpening testified that she did not serve Vargas anything. She states that Sabrina did come up to her 2-3 times to get a drink for herself. (Monica Corpening Deposition, Tr. Ex. 168, pp. 8, 10-12).

32. At approximately 11:20 pm, it was brought to Manager Vianueva's attention by Sabrina and Secrets' bouncer, Tyrone Johnson, that Vargas was inappropriately touching Sabrina and had assaulted her. Manager Vianueva knew that Vargas had violated Ohio law and committed a crime, which Sabrina and Johnson both confirmed too. Manager Vianueva spent 15-20 minutes having direct, face-to-face contact with Vargas. (Robert Vianueva Deposition, pp. 30-34).

33. Plaintiffs have presented the testimony of three separate experts who have opined that Vargas would have been giving off visible and noticeable signs of intoxication throughout his time at Secrets. (Expert Report of E. Don Nelson, Pharm. D., Tr. Exs. 134-135; Expert Report of Gregory Baeppler, Tr. Ex. 140; Expert Report of James Crawford, ACTAR, Tr. Ex. 132).

34. This would have remained true between the 11:20-11:35 pm time period that Manager Vianueva and Tyrone Johnson had direct, face-to-face contact with Vargas after he assaulted the dancer. Indeed, when the fatal crash happened about ten minutes later at around 11:44-11:45 pm, the toxicological evidence shows that Vargas' blood alcohol content was likely .263 to .265-well over three times the legal limit. In addition, a serum blood draw taken at Metrohealth revealed plasma alcohol content of .286, and the Cuyahoga County Medical Examiners' Office results for blood drawn more than two hours after the crash still confirmed a BAC level of .235. (Tr. Exs. 97-98; Richard Cerny Deposition, Tr. Ex. 154, pp. 18-19, 71; See also Deposition of E. Don Nelson, Phann. D., pp. 22-23; Deposition of John F. Wyman, Ph.D., p. 28).

-10-

35.  Manager Vianueva testified he didn't call the police to intervene with Vargas "because they take forever" and have a slow response time. (Robert Vianueva Deposition, p. 35). However, this testimony is contradicted by the evidence. Bouncer Tyrone Johnson confirmed that an off-duty uniformed Cleveland Police Officer named Butler was actually working on premises at Secrets on Saturday, April 5, 2014 while Vargas was there-just like one does every Thursday through Sunday nights at Secrets. Johnson also confirmed that if there is an intoxicated patron and you don't want them to drive, you don't even have to call the police because a uniformed officer is already there, and that Officer Butler would have intervened if requested, but no one asked for his help. (Tyrone Johnson Deposition, Tr. Ex. 170, pp. 25-27).

36.  As Secrets' General Manager and part owner, Vianueva was certainly aware that a uniformed Cleveland Police Officer was working on premises at his own club on this Saturday night while Vargas was there, just like one does every Thursday through Sunday night week in and week out. Officer Butler was immediately available to intervene so Secrets could fulfill its admitted obligation and duty to prevent the noticeably intoxicated Vargas from driving, just as he was immediately available to professionally handle Vargas' on-premises assault of the dancer that had just taken place.  But here, both Manager Vianueva and Bouncer Tyrone Johnson chose not to report Vargas' extreme intoxication and assault to Officer Butler.

37.  Manager Vianueva instead chose to run an unauthorized $100.00 transaction on the credit card Vargas had on him bearing the name of a "Sandra Torres," despite agreeing that he is only allowed to run a credit card when the name on the card matches the name on the patron's driver's license.  Incredibly, Vianueva claims this is the only time this type of unauthorized credit card transaction has ever been done at Secrets. (Robert Vianueva Deposition, pp. 56-57, 68-69, 72, 88, 116; Tr. Ex. 49).

38.  Manager Vianueva ran the unauthorized charge on Ms. Torres' credit card at 11:35 pm. (Tr. Ex. 49). Right after the charge went through, he promptly had bouncer Tyrone Johnson personally escort Vargas out of Secrets.

39.  Vargas' ejection from Secrets was captured on a 16-channel, 9-camera video system. Johnson initially escorted Vargas out at 11:36 pm. Three minutes later, Vargas is seen walking back to Secrets' entrance and re-entering the lobby. He can then be seen on the video exiting Secrets after being personally escorted out a second time (he returned after the first ejection to get his jacket) at approximately 11:41 pm. The video evidence depicts Vargas as confused and initially unable to locate his vehicle before finally finding it and then driving out of Secrets' parking lot. (Tr. Ex. 52; Expert Report of Gregory Baeppler, Tr. Ex. 140, at pp. 6, 9).

-11-

40.   The fatal crash occurred a few minutes later around 11:44-11:45 pm, when the toxicological evidence shows that Vargas' BAC was likely more than 3 times the legal limit and likely between .263 to .265. (Expert Report of E. Don Nelson, Tr. Exs. 134-135; See also Tr. Exs. 97 & 98; Richard Cerny Deposition, Tr. Ex. 154, pp. 18-19, 71; Deposition of E. Don Nelson, Pharm. D., pp. 22-23; Deposition of John F. Wyman, Ph.D., p. 28).

41.   Vargas pulled out of Secrets' parking lot and proceeded a short distance to the Interstate 480 and W. 130th Street entrance/exit ramp. He was so intoxicated that he entered I-480 westbound in an eastbound direction going the wrong way on the exit ramp, passing multiple wrong way signs located on the ramp. (Tr. Ex. 7).

42.   Vargas entered the middle lane of I-480 westbound going the wrong way when he struck a 1992 Plymouth Acclaim operated by Antonio Rodriguez in which Desiree Snyder was a passenger. Following the crash, first responders and emergency personnel flooded to the scene, including the Ohio State Highway Patrol, the Cleveland Police Department, the Cleveland Fire Department, and EMS. The initial call to the 911 dispatch center took place at 11:45 p.m., just minutes after Vargas was twice personally escorted out of Secrets at the direction of its General Manager and minority owner, Robert Vianueva.

(State Court Action Findings of Fact and Conclusions of Law, Docket #17-4 at pp. 1-42.  See

original for footnotes and for discussion of damages.)

Based on the facts set forth above, the State Court concluded as follows:

II.     Conclusions of Law.

1.   In Plaintiffs' Complaint, they assert separate, distinct and independent causes of action against Defendant Secrets for: (1) statutory violations involving the sale or service of alcohol (Count Four), and (2) common law negligence claims unrelated to the sale or service of alcohol (Count Five).  Pursuant to the Stipulation filed by Plaintiffs and Secrets, this Court's Findings of  Fact and Conclusions of Law pertain solely to Secrets' liability for common law negligence (Count Five) and for the survivorship and wrongful death damages resulting therefrom (Counts One and Seven). There are no statutory claims for this Court to adjudicate here.

2.   Plaintiffs' common law negligence claims are sufficiently distinct, separate and independent from a statutory cause of action premised on the sale or service of alcohol. Their common law negligence claims are based on the case-specific facts and attendant circumstances involved here and relate to Secrets'

negligence in failing to fulfill its admitted duty of preventing a noticeably intoxicated patron from driving. This includes Secrets' negligence in failing to inform the Cleveland Police Officer working on its premises of Julio Vargas' noticeably and extremely intoxicated condition, of his assault of a club dancer in violation of Ohio law, and of his unauthorized use of a woman's credit card that was clearly not his own. It also includes Secrets' negligence in failing to take any action whatsoever to prevent Vargas from driving, despite the foreseeable consequences of its inaction in these regards, along with its negligence in instead choosing to personally escort Vargas out of the club to ensure that he would drive away in the extremely intoxicated condition he was in.

3.  To establish actionable negligence, one must show the existence of a duty, a breach of that duty and injury resulting proximately therefrom. *Mussivand v. David* (1989), 45 Ohio St. 3d 314, 318. In general, the existence of a duty largely depends on the foreseeability of the injury. *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St. 3d 75.  The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act. *Id.*  In addition, the Ohio Supreme Court has held that:

> If an injury in the natural and probable consequence of a negligent act and it is such as should have been foreseen in light of all of the attendant circumstances, the injury is then the proximate result of the negligence. It is not necessary that the defendant should have anticipated the particular  injury. It is sufficient that his act is likely to result in an injury to someone.

*Mussivand*, 45 Ohio St.3d at 321; *Strother v. Hutchison* (1981), 67 Ohio St.2d 282, 287.

4.  In a related vein, while foreseeability  is one [sic] the factors to be considered in determining whether a duty exists, the trier-of-fact need only find that the potential for an injury could have been appreciated by the defendant. *Turner v. Cent. Local School Dist.*, 3rd Dist. No. 4-95-8, 1995 WL 442498 (July 27, 1995), pp. *2-3; *Cromer v. Children's Hosp. Med Ctr. of Akron*, 142 Ohio St.3d 257, 2015-0hio-229, ¶24.

5.  Simply put, everyone owes a responsibility to use reasonable care to prevent foreseeable harm to others. *Id.; Commerce & Indust. Ins. Co. v. Toledo* (1989), 45 Ohio St.3d 96, 98. Indeed, Ohio common law has long imposed a general duty of "due care" upon all individuals and corporate entities. See generally *Mussivand v. David*, 45 Ohio St. 3d at 318- 319; *Commerce & Industry Ins. Co.*, 45 Ohio St. 3d at 98; *Huston v. Konieczny* (1990), 52 Ohio St. 3d 214, 217. In recognition that the legal obligations imposed in this regard are not fixed or rigid, the Supreme Court of Ohio has explained that:

Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall. (Prosser, Paragraph Revisited (1953), 52 MICH. L. REV. 1, 15). *Mussivand*, 45 Ohio St. 3d at 318, quoting *Weirum v. RKO Gen., Inc.* (1975), 15 Cal. 3d 40, 46.

6.  Once a common-law duty is found to exist, the defendant is required to exercise that degree of care which an ordinary careful and prudent person would exercise under the same or similar circumstances. *Commerce & Indust. Ins. Co.*, 45 Ohio St.3d at 98; *Strother v. Hutchison*, 61 Ohio St.2d at 285.

7.  This Court concludes, based on the unique and case-specific facts and attendant circumstances involved here, that Secrets had a common law duty to use reasonable care to prevent foreseeable harm to others, including to Desiree Snyder and other members of the motoring public.  Beyond this Court's determination in this regard, Secrets itself admits that it has an obligation or duty to prevent known intoxicated patrons from driving. (Robert Vianueva Deposition, pp. 53-54, 104-105, 163-165; Expert Report of Gregory Baeppler, p. 10, Tr. Ex. 140). This includes Secrets' duty to call or involve the police to prevent patrons who are known to be noticeably intoxicated from driving, or to, at a minimum, provide them with a ride or call them a taxi. (Id.).

8.  This Court's determination is also supported by the fact that this was not a situation in which an extremely intoxicated patron merely slipped away undetected or under the radar unbeknownst to the establishment or its management.  To the contrary, Vargas was physically brought to Secrets' management after assaulting a dancer on its premises and was for all intents and purposes detained by Secrets' management for a period of at least 15-20 minutes between at least 11:20-11:35 pm. Secrets' General Manager and minority owner was still having face-to-face interactions with Vargas ten minutes or less before the fatal crash occurred around 11:44-11:45 pm.

9.  The toxicological evidence shows that Vargas' BAC was more likely than not between .263-.265 and more than 3 times the legal limit when the crash happened just minutes after he was personally escorted out of Secrets and drove away. (Tr. Exs. 97-98; Richard Cerny Deposition, .Tr. Ex. 154, pp. 18-19, 71; Expert Report of E. Don Nelson, Pharm.D., Tr. Ex. 134; See also Deposition of E. Don Nelson, Pharm. D., pp. 22-23; Deposition of John F. Wyman, Ph.D., p. 28). While Secrets' management was having "the face-to-face encounter with Vargas between at least 11:20-11:35 pm, he would have been in that same extremely intoxicated condition, which was objectively evident to anyone who was paying attention. Beyond that, they knew he had just violated Ohio law by inappropriately touching and assaulting a dancer. (Robert Vianueva Deposition,

pp. 30-34).

10.   Based on the toxicological evidence, this Court agrees with Plaintiffs' experts that any claim by Manager Vianueva that he did not perceive Vargas' noticeably intoxicated state is incomprehensible. (Expert Report of Gregory Baeppler, Tr. Ex. 140, at p. 10; See also Expert Report of E. Don Nelson, Tr. Ex. 134, p.3, 10 (opining that Vargas was visibly, noticeably and observably intoxicated with alcohol throughout the time he was at Secrets and at the time of the crash at approximately 11:44 pm). In fact, multiple experts have opined that Vargas would have been giving off objectively noticeable and visible signs of intoxication at this time. (Expert Report of Gregory Baeppler, Tr. Ex. 140, pp. 10-11; Expert Report of E. Don Nelson, Pharm. D., Tr. Ex. 134, p. 3; Expert Report of James Crawford, ACTAR, Tr. Ex. 132, pp. 11-12).

11.   Based on the unique and case-specific facts and attendant circumstances of this case, this Court also holds that Secrets breached its common law duty of reasonable or due care.  This includes but is not limited to a breach of its admitted duty to prevent noticeably intoxicated patrons from driving, as well as its breach of its. duty to use reasonable care to prevent foreseeable harm to others under the same or similar attendant circumstances as those involved in this unique case.  This Court further holds that Secrets' negligent acts and omissions as described herein are a proximate cause of Desiree Snyder's conscious pain and suffering and wrongful death.

12.   Secrets' Management acknowledges that if Vargas was intoxicated, they would have to call the police. (Robert Vianueva Deposition, pp. 53-54).  But here, Vargas was more than merely intoxicated.  He was over three times the legal limit, had just criminally assaulted a dancer and was, contrary to Secrets' own rules, trying to use a credit card that was clearly not his own.

13.   Incredibly, when Secrets' General Manager was questioned about why he did not involve the police, he testified that he did not do so "because they take forever" and have too slow a response time. (Robert Vianueva Deposition, p. 35). This testimony lacks credibility and is contradicted by the evidentiary record in this case.  As the on-premises General Manager and minority owner of Secrets, Vianueva knew that a uniformed Cleveland Police Officer was actually working on-premises at Secrets that evening, just like one does every Thursday through Sunday night at his own club.  Bouncer Tyrone Johnson, who also worked at Secrets that evening, confirmed that a uniformed Cleveland Police Officer named Butler was working on premises at Secrets that evening.  Johnson also confirmed that if there is a known intoxicated patron in the club, you don't even have to call the police because a uniformed officer is already there.  He also testified that Officer Butler would have intervened if requested, but that no one asked for his help. (Tyrone Johnson Deposition, Tr. Ex. 170, pp. 25-27).

-15-

14.  This begs the questions-if Secrets has an on-premises uniformed Cleveland Police Officer working at its premises, what good is that if Secrets' management and personnel choose not to report that an extremely intoxicated patron has just assaulted a dancer (and committed a crime in the process) and is also attempting to make unauthorized transactions on a credit card that is obviously not his own?  It is clear to this Court based on the evidentiary record, and also particularly disturbing, that Secrets was more interested in running a cash transaction on Sandra     Torres' credit card for its own benefit instead of getting its on-premises Cleveland Police Officer involved with Vargas or taking any other reasonable actions to fulfill its common law duty of care, including its admitted duty to prevent a known and noticeably intoxicated patron like Vargas from leaving and driving away.

15.  But here, Secrets took things even a step further.  By choosing to personally escort Vargas out of its club in an extremely intoxicated condition, which cannot reasonably be disputed based on the toxicological evidence, Secrets did nothing to meet its common law duties.  It instead only ensured that Vargas would drive away in the state he was in, as shown on its own surveillance videos. In so doing, it was foreseeable to Secrets, just as it would be to any person or entity using reasonable care under these same or similar circumstances, that serious injury or even worse was likely to occur.  Again, these negligent actions and omissions by Secrets are clearly separate, distinct and independent from anything having to do with selling or serving alcohol.

16.  Had Secrets notified Officer Butler of Vargas' extremely intoxicated condition, Vargas wouldn't have driven anywhere, and the crash that killed Desiree Snyder would not have occurred.  This Court agrees with the expert opinion of Gregory Baeppler, himself a former Cleveland Police Officer with 31 years on the force, that Officer Butler would have been trained and duty-bound to intervene and prevent Vargas from driving.  (Tr. Ex. 140, pp. 9-10). This is particularly true in light of the additional facts and attendant circumstances that were present when Manager Vianueva had 15-20 minutes of direct face-to-face contact with Vargas between at least 11:20-11:35 pm. This includes the fact that Vargas had just criminally assaulted a dancer and was also attempting to use a credit card that was obviously not his own. In the first instance, this trained officer would have quickly and easily recognized the numerous visible and noticeable signs of intoxication that any person with a BAC of likely 0.263-0.265 would be giving off, and would have prevented Vargas from driving.  Beyond that, this trained officer would more likely than not have taken steps to verify Vargas' identity and would have quickly learned that Vargas had a suspended driver's license, an outstanding DUI warrant, and had just recently been charged with another DUI and hit and run charges in Cleveland just a few months earlier. (Tr. Exs. 11, 34; Richard Cerny Deposition, Tr. Ex. 154, pp. 21-23, 57; See also docket in Cleveland Municipal Court Case No. 2014 TRC 005532). Alternatively, the officer would have been required to investigate and take appropriate actions in

-16-

response to Vargas' criminal assault of the club's dancer, including by having Vargas detained and/or charged.

17.  In short, Vargas would have driven nowhere that evening had Secrets' management reasonably involved Officer Butler as they should have done, or had they otherwise exercised reasonable care in taking any other type of action to fulfill their admitted duty to prevent known intoxicated patrons like Vargas from driving based on the case-specific facts and attendant circumstances involved here.

18.  Instead, Secrets negligently chose to bypass Officer Butler altogether and negligently chose to force Vargas to leave its premises in his extremely intoxicated condition -not once but twice- but not until after first making sure that the credit card transaction run by Manager Vianueva had successfully gone through. Once in Secrets' parking lot, the video evidence shows Vargas confused and initially unable to locate his vehicle before finally finding it and driving away. (Tr. Ex. 52; Expert Report of Gregory Baeppler, Tr. Ex. 140, at pp.6, 9). Roughly three minutes later, Desiree Snyder was drowning in her own blood due to her crash-related injuries. (Deposition of Leroy Norris, III, Tr. Ex. 160, p. 49).

19. As noted herein, these Findings of Fact and Conclusions of Law pertain solely to Secrets' common law negligence and a determination of its proportionate share of the liability for the survivorship and wrongful death damages sustained by Decedent Desiree Snyder and her Estate. When, as here, the case-specific facts and attendant circumstances show independent acts or omissions of negligence that are separate, distinct and independent from the sale or service of alcohol, Ohio Courts have permitted common law negligence actions to be maintained against the establishment.  *Mid-Continent Ins. Co. v. Coder*, 563 Fed. Appx. 422 (6th Cir. 2014); *Prince v. Buckeye Union Ins. Co.*, 5th Dist. Richland No. 92-CA-6, J 992 WL 362578 (Dec. 2, 1992); *Auto-Owners Ins. Co. v. JC KC, Inc.*, 9th Dist. Summit No. 18937, 1998 WL 766695 (Nov. 4, 1998); *see also Williams v. Saga Enterprises, Inc.*, 225 Cal.App.3d 142, 274 Cal.Rptr. 90I (Cal.App.1990) (genuine issue of fact of whether employees allowing drunk patron to drive away breached duty to innocent motorist).

20.  Just as in the foregoing cases, the negligence at issue here is separate, distinct and independent from anything having to do with the sale or service of alcohol, as well-supported by the evidentiary record. However, the case-specific facts and attendant circumstances involved here are even more egregious than those involved in the cases cited above.  Here, unlike in those cases, a uniformed police officer was actually on the club's premises, but its management negligently chose not to get him involved to handle a patron who was objectively and extremely intoxicated.  Unlike those cases, moreover, the extremely intoxicated patron had just committed a criminal assault on the club's premises, further

-17-

justifying the need for immediate police involvement to prevent Vargas from leaving and driving away.

21.  To summarize, Secrets' negligence claims in this case are separate, distinct and independent from any statutory claims involving or arising from its sale or service of alcohol.  In fact, Secrets'  failure to cooperate in the official police investigation or to preserve or produce its cash receipts and other evidence pertaining to the night of April 5, 2014 make it difficult for this or any other court to ascertain how much alcohol Secrets may have served to Vargas beyond the one beer it admits serving him more than two hours before its management chose to twice eject him. That said, the following facts are known and have been established.  Here, Vargas had at least 19 or more drinks before arriving at Secrets in a blacked out state. The toxicological evidence shows he was objectively, extremely and noticeably intoxicated throughout his time at Secrets, including during the 11:20-11:35 time period that Secrets' management had constant and direct face-to-face interactions with Vargas.  This was ten minutes or less before the fatal crash occurred. Unlike the situation where a drunk patron slips out of a bar undetected or has no reason to be noticed, Secrets' management spent 15-20 minutes with Vargas while his BAC was more likely than not well over three times the legal limit and when he would have certainly been giving off noticeable signs of intoxication.  Beyond that, Secrets had actual knowledge that Vargas had just violated Ohio law and committed a crime by physically assaulting one of its dancers, and he was also asking Secrets' management to make unauthorized credit card cash advances on a card that they knew was clearly not his.  Secrets had multiple reasons and ample opportunity to involve its on-premises Cleveland Police Officer with Vargas, yet it instead chose to do nothing-other than to run Sandra Torres' credit card for its own benefit before then twice personally escorting Vargas out of its club. No actions were taken by Secrets to fulfill its admitted duty to prevent a known intoxicated patron from driving so as to prevent foreseeable injuries to other motorists like Desiree Snyder. In fact, the only actions taken by Secrets' management ensured that Vargas would drive away, just as its own surveillance footage shows he did-about three minutes before Desiree Snyder was dying due to its negligence.

22.  For the reasons set forth above, this Court enters judgment in favor  of Plaintiffs and against Defendant GLMR, Inc. dba Secrets Gentleman's Club and its related Defendants in the amount of $24,114,917.00 . . .

On the issue of apportionment, this Court apportions liability for these damages to Defendant GLMR, Inc. dba Secrets Gentleman's Club and its related Defendants in the amount of one-third (33 1/3%), to Geza Enterprises, Inc. dba Gigi's Lounge in the amount of one-third (33 1/3%) and to Julio Vargas in the amount of one-third (33 1/3%). Based on this apportionment, this Court hereby enters a final judgment in favor of Plaintiffs and against Defendant GLMR. Inc. dba Secrets Gentleman's Club and its related Defendants in the amount of

-18-

$8,038,305.66.

FINAL.  IT IS SO ORDERED.

(State Court Action Findings of Fact and Conclusions of Law, Docket #17-4 at pp. 17-27.)

As stated above, on August 15, 2016, Mesa filed its Complaint for Declaratory Judgment with this Court pursuant to 28 U.S.C. § 2201(a) and Ohio Rev. Code § 2721.03, asking the Court to declare that it has no duty to indemnify Secrets in the underlying action.  (Docket #1).  On November 16, 2016, Defendants, Sharon and Terry Snyder filed their Answer and Counterclaims for Declaratory Judgment, Breach of Contract, Bad Faith and Breach of Fiduciary Duty (Docket #17), and Defendants Secrets/GLMR filed their Answer and Counterclaims for Declaratory Judgment, Breach of Contract, Breach of Fiduciary Duty and Bad Faith (Docket #18).  At a Status Conference held on December 6, 2016, the Parties agreed upon a bifurcated case management plan, by which declaratory judgment would be decided first.

On January 24, 2017, Mesa filed a Motion for Judgment on the Pleadings (Docket #30) and both Secrets/GLMR and the Snyders filed Motions for Partial Summary Judgment (Docket #s 31 and 32).  Mesa asks the Court to find it had no duty to defend or indemnify Secrets and asks the Court to dismiss the Counterclaims filed against it by Secrets/GLMR and the Snyders. Mesa argues that the Ohio Dram Shop Act is the exclusive remedy for the Snyders' claims against Secrets and that the Trial Court's decision – finding Secrets liable for common law negligence separate, distinct and independent from any statutory claims arising from its sale or service of alcohol to Mr. Vargas – runs contrary to Ohio law; that all of the Snyders' allegations are premised upon Mr. Vargas's intoxication and fall within the Policy's Liquor Liability exclusion; that the State Court's liability determination is not entitled to preclusive effect; and, that the issues before this Court were never actually litigated because Secrets conceded liability

-19-

and agreed to allow the Snyders to obtain a judgment against it.  Secrets/GLMR and the Snyders argue that Mesa is bound by the State Court's Judgment and liability determinations and that Secrets is entitled to both defense and indemnity from Mesa under the terms of the Policy.  Both Secrets and the Snyders ask the Court to enforce the State Court Judgment.

All of the pending Motions are fully briefed.  The Parties argued their positions to the Court during the May 31, 2017 Status Conference and, as permitted by the Court, all Parties filed Supplemental Briefs on June 16, 2017.  (Docket #s 52, 53 and 54.)

**III.**  **Discussion**.

    **A.**  **Duty to Indemnify.**

In Ohio, the doctrine of res judicata encompasses the two related concepts of claim preclusion and issue preclusion.  *State ex rel. Davis v. Pub. Emp. Ret. Bd.*, 120 Ohio St. 3d. 386, 392, 2008 Ohio 6254, 899 N.E.2d 975 (2008). "Claim preclusion prevents subsequent actions, by the same parties or their privies, based on any claim arising out of a transaction that was the subject matter of a previous action." *O'Nesti v. DeBartolo Realty Corp.,* 113 Ohio St. 3d 59, 61, 2007 Ohio 1102, 862 N.E.2d 803 (2007) (citing *Fort Frye Teachers Assn., OEA/NEA v. State Emp. Relations Bd.,* 81 Ohio St. 3d 392, 395, 1998 Ohio 435, 692 N.E.2d 140 (1998).  Claim preclusion also bars subsequent actions with claims that "could have been litigated in the previous suit." *O'Nesti,* 113 Ohio St. 3d 59, 61 (citing *Grava v. Parkman Twp.*, 73 Ohio St. 3d 379, 382, 1995 Ohio 331, 653 N.E.2d 226 (1995).  By contrast, issue preclusion, or collateral estoppel, prevents the relitigation of any fact or issue when the fact or issue "(1) was actually and directly litigated in the prior action; (2) was passed upon and determined by a court of competent jurisdiction; and (3) when the party against whom [issue preclusion] is asserted was a party in privity with a party to the prior action." *Thompson v. Wing*, 70 Ohio St. 3d 176, 183, 1994 Ohio

358, 637 N.E.2d 917 (1994)(citing *Whitehead v. Gen. Tel. Co.*, 20 Ohio St. 2d 108, 49 O.O.2d

435, 254 N.E.2d 10, paragraph two of syllabus (1969)).

The State Court is a Court of competent jurisdiction and Secrets' liability for common-

law negligence was actually and directly litigated in the State Court.  A consent judgment has the

same binding effect as one entered by the court after summary adjudication or full trial.  *See*

*Ohio Pyro, Inc. v. Ohio Dep't of Commerce*, 115 Ohio St. 3d 375, 380, 2007 Ohio 5024, 875

N.E. 2d 550, (2007)*; Gilbraith v. Hixson*, 32 Ohio St. 3d 127, 129, 512 N.E.2d 956 (1987);

*Horne v. Woolever*, 170 Ohio St. 178, 182, 10 Ohio Op. 2d 114, 163 N.E.2d 378 (1959);

*Andrade v. Credit Gen. Ins. Co.*, 2000 Ohio App. LEXIS 5531, at *24 (Ohio Ct. App., Stark

County Nov. 20, 2000)*; City of Columbus v. Alden E. Stilson & Assocs.,* 90 Ohio App. 3d 608,

615, 630 N.E.2d 59 (Franklin County 1993); *Goetz v. First Benefits Agency*, 1997 Ohio App.

LEXIS 4632 (Ohio Ct. App., Summit County Oct. 15, 1997).  Mesa was in privity with Secrets

and could have sought a declaration as to its rights and obligations or otherwise intervened in the

State Court Action, but failed to do so despite having ample opportunity.

Collateral estoppel applies to an insurer who denies coverage and a defense to its

insureds and chooses not to intervene or otherwise protect its interests or those of its insureds.

*ALD Concrete & Grading Co. v. Chem-Masters Corp.*, 111 Ohio App. 3d 759, 764, 677 N.E.2d

362 (Franklin County 1996)("Because Buckeye Union in the present case was given notice and

opportunity to defend in the underlying action, and declined to do so based on an asserted lack of

coverage, appellant properly concedes upon appeal that it is collaterally estopped from attacking

the factual and legal conclusions of the trial court in the underlying action, most significantly the

trial court's finding that the damages were caused by the sole negligence of Chem-Masters.")

(citing *Howell v. Richards*, 45 Ohio St. 3d 365, 367-68, 544 N.E.2d 878, 881 (1989)).  See also

-21-

*Blair v. Mann*, 1999 Ohio App. LEXIS 1630, at *3 (Ohio Ct. App., Lawrence County Apr. 8, 1999); *Patterson v. Tice*, 91 Ohio App. 3d 414, 419, 632 N.E.2d 962 (Tuscarawas County 1993); *Stephenson v. Duriron Co.*, 292 F. Supp. 66, 82, 1968 U.S. Dist. LEXIS 10142 (S.D. Ohio Oct. 21, 1968).  While Mesa may disagree with the State Court's determination that Secrets is liable for common law negligence – separate, distinct and independent from anything having to do with the sale or service of alcohol – the doctrine of collateral estoppel precludes Mesa from attempting to relitigate Secrets' liability in this Court.  Further, there is nothing to suggest that the State Court failed to consider all available evidence or thoroughly evaluate the claims before it and, had Mesa wished to challenge the evidence or opine as to the applicability of a particular case to the facts and circumstances of this case, the appropriate place to do so was in the State Court Action.

In light of the foregoing, the Court turns to the Policy language.  The Policy provides coverage for bodily injury claims caused by an "occurrence" during the policy period of 11/22/13-11/22/14.  The Policy defines "bodily injury" to include death, and "occurrence" is defined as an "accident," which is not defined in the Policy.  Under Ohio law, when a liability insurance policy defines "occurrence" as an "accident," a negligent act committed by an insured qualifies as an "occurrence."  The Policy's Liquor Liability exclusion applies solely to claims for "(1) causing or contributing to the intoxication of any person (2) the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or (3) any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages."  As determined by the State Court, Secrets is liable for the Ms. Snyder's death based on its negligent acts that are separate, distinct, independent from and unrelated to the sale and service of alcohol and/or statutory Dram Shop provisions.  Accordingly, pursuant to the express

-22-

language of the Policy, Mesa is required to indemnify Secrets on the Snyders' common-law

negligence claims which have been adjudicated to final judgment in the State Court.

**B.     Duty to Defend.**

Under Ohio law, an insurer's duty to defend arises when a complaint alleges claims that

could arguably be covered under the applicable insurance policy. *Cincinnati Ins. Co. v. CPS*

*Holdings, Inc.*, 115 Ohio St. 3d 306, 307, 2007 Ohio 4917, 875 N.E.2d 31 (2007); *City of*

*Sharonville v. Am. Emplrs. Ins. Co.*, 109 Ohio St. 3d 186, 189, 2006 Ohio 2180, 846 N.E.2d 833

(2006).   "An insurer has an absolute duty to defend an action when the complaint contains an

allegation in any one of its claims that could arguably be covered by the insurance policy, even

in part and even if the allegations are groundless, false or fraudulent." *City of Sharonville*, 109

Ohio St. 3d 186, 189.   Initially, the insurer's obligation to defend is determined by the scope of

the pleadings, but may also arise at a point subsequent to the filing of the complaint, in which

case the burden is on the insured to demonstrate that the allegations in the complaint are

sufficient to arguably bring the claims within the policy's coverage. *M/G Transp. Servs. v.*

*Water Quality Ins. Syndicate*, 234 F.3d 974, 977 (6th Cir. Ohio 2000) (citing *City of Willoughby*

*Hills v. Cincinnati Ins. Co.*, 9 Ohio St. 3d 177, 179, 9 Ohio B. 463, 459 N.E.2d 555 (1984));

*Cincinnati Ins. Co. v. Anders*, 99 Ohio St. 3d 156, 159, 2003 Ohio 3048, 789 N.E.2d 1094 (2003)

(citing *Willoughby Hills*, 9 Ohio St. 3d at 179; *XXL of Ohio, Inc. v. City of Broadview Heights*,

341 F. Supp. 2d 825, 841 (N.D. Ohio 2004)).

An insurer is not required to "defend any claim that is clearly and indisputably outside

the contracted policy coverage." *CPS Holdings*, 115 Ohio St. 3d 306, at ¶ 6 (citing *Preferred*

*Risk Ins. Co. v. Gill*, 30 Ohio St. 3d 108, 113, 30 Ohio B. 424, 507 N.E.2d 1118 (1987)).   There

is no duty to defend "if there is no set of facts alleged in the underlying complaint against the

insured that, if proven true, would invoke coverage." *Cincinnati Indem. Co. v. Martin*, 85 Ohio St. 3d 604, 605, 1999 Ohio 322, 710 N.E.2d 677 (1999).

The acts of negligence alleged in the State Court Complaint were not "indisputably outside the contracted policy coverage" and could arguably have been covered under the Policy, thereby triggering Mesa's duty to defend. *Cincinnati Ins. Co.*, 115 Ohio St. 3d 306, 307.   While there are only a small number of cases in Ohio in which Courts have permitted claims of common-law negligence to stand alone, such cases do in fact exist and each involved a fact-specific inquiry as to whether the alleged negligent conduct alleged could be separated from the sale and service of alcohol.[2]

The Complaint specifically references that prior to arriving at Secrets, Mr. Vargas patronized Gigi Lounge for a significant period of time and drank alcohol; drove to and entered Secrets for a period of time; continued to act noticeably intoxicated and impaired at Secrets; that Secrets' employees and management knew, or reasonably should have known, that Mr. Vargas was intoxicated based on his behavior; and, that Secrets negligently caused Mr. Vargas to leave and allowed him to drive away from Secrets without taking any precautions to prevent him from driving away or reporting his behavior, thereby breaching their duty of care to undertake reasonable action to avoid foreseeable harm to others.  While the Complaint did state "Gigi Lounge and Secrets negligently and recklessly served Mr. Vargas alcohol to the point he became

---

[2]

       Although Mesa did not provide a defense for Secrets, it did defend Gigi Lounge in the Snyders' State Court lawsuit because Gigi had purchased coverage for Dram Shop Claims.  Interestingly, in their Motion for Summary Judgment, attorneys for Gigi's noted that Ohio courts have permitted common-law negligence claims "to proceed in fact-specific cases were there was some act on the part of the establishment that was independent of the furnishing of alcohol."  (Docket #36, Exhibit B, p. 10.)

visibly intoxicated and impaired," the allegations set forth in the Complaint contemplate action or inaction on the part of Secrets' employees which would arguably amount to negligence whether or not Mr. Vargas was sold or consumed any alcohol at Secrets.

Further, even if its initial review of the Complaint did not convince Mesa of its duty to defend Secrets, Mesa was contacted repeatedly by Secrets' Counsel regarding the fact that allegations of common-law negligence – separate and distinct from causing or contributing to Mr. Vargas's intoxication or the sale or service of alcohol – were being asserted.  (See Docket #17, Page ID#144-153); Docket #17-6; Docket #17-9; Docket #17-11; Docket #17-12; Docket #18, PageID 411, ¶ 13.)  Counsel for Secrets notified Mesa of the Sixth Circuit's decision in *Mid-Continent Ins. Co. v. Coder*, 563 Fed. Appx. 422, 2014 U.S. App. LEXIS 7460 (6th Cir. Ohio 2014), in which the Court found the insurer had a duty to defend its insured against a negligence claim that did not fall within the liquor liability exclusion set forth within the policy at issue.  Counsel retained by Mesa to represent Gigi's participated in the State Court Action, and observed proceedings which were limited to the question of Secrets' liability.  Thus, even if its initial review of the Complaint left Mesa with the impression it had no duty to defend, Mesa's duty to defend arose shortly thereafter, when further proceedings and communication from Counsel made it clear that Secrets' actions – separate and apart from the sale or furnishing of alcohol to Mr. Vargas, or Mr. Vargas's consumption of alcohol at Secrets –  could arguably constitute common law negligence.  Accordingly, Mesa had a duty to defend Secrets in the underlying State Court Action.

**IV.    Conclusion.**

Based on the foregoing, the Court finds Mesa had a duty to defend and indemnify Secrets in the underlying State Court Action.  The Motion for Judgment on the Pleadings filed by

Plaintiff, Mesa Underwriters Specialty Insurance Company, (Docket #30) is hereby DENIED. The Motions for Partial Summary Judgment filed by Defendants, GLMR, Inc. and Secrets Gentleman's Club (Docket #31) and Defendants Sharon and Terry Snyder (Docket #32) are hereby GRANTED to the extent both seek a determination as to Mesa's duty to defend and indemnify.

In an effort to conserve the resources of all Parties, and in light of this Court's determination that Mesa had a duty to defend and indemnify Secrets/GLMR in the State Court Action, all remaining claims are hereby DISMISSED WITHOUT PREJUDICE and may be refiled in proper form on or before October 1, 2017 if warranted.

All pending Motions are hereby TERMINATED.

This Case is hereby TERMINATED.

IT IS SO ORDERED.

s/Donald C. Nugent
DONALD C. NUGENT
United States District Judge

DATED: July 21, 2017

-26-